DA 13-0610

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 242

TINA MALCOMSON,

      Petitioner and Appellee,

  v.

LIBERTY NORTHWEST,

      Respondent and Appellant.

APPEAL FROM:    Montana Workers' Compensation Court, WCC No. 2008-2103
                  Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Larry W. Jones (argued), Wills Law Firm, Missoula, Montana

      For Appellee:

          Stacy Tempel-St. John (argued), Linnell, Newhall, Martin & Schulke, P.C.,
          Great Falls, Montana

      For Amicus Curiae:

          David Sandler (argued), Eddy Sandler Trial Attorneys, Kalispell, Montana
          (*Attorney for the Montana Trial Lawyers Association*)

          Kevin Braun, Special Assistant Attorney General, Helena, Montana
          (*Attorney for the State of Montana*)

                     Oral Argument:  May 6, 2014
                Submitted on Briefs:  July 15, 2014
                        Decided:  September 10, 2014

Filed:

                             Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1    Tina Malcomson filed a workers' compensation claim in December 2007 after being injured while working as manager of Freemo's Pizza in Missoula, Montana. Liberty Northwest (Liberty) was the insurer for the claim. After Malcomson withdrew her consent to allow Liberty and its agents to have ex parte communications with her medical care providers, Liberty terminated her benefits, claiming that Malcomson's withdrawal of consent violated §§ 39-71-604 and 50-16-527, MCA (2007).[1] Malcomson sued to have her benefits reinstated, asserting that the above statutes were unconstitutional. The Workers' Compensation Court (WCC) held that § 39-71-604(3), MCA, as applied to the facts in this case, violated Malcomson's constitutional right of privacy. The WCC directed Liberty to reinstate benefits and held that it could not have ex parte communications with Malcomson's medical team without Malcomson's knowledge and opportunity to participate. In addition, the court held that it lacked jurisdiction to determine the constitutionality of § 50-16-527(5), MCA. Liberty appeals. We affirm.

## ISSUE

¶2    A restatement of the issue on appeal is whether the WCC erred in concluding that § 39-71-604(3), MCA, violated Malcomson's right of privacy set forth at Article II, Section 10 of the Montana Constitution.

---

[1] The workers' compensation law in effect on the injured employee's last day of work governs the claim. *Mont. State Fund v. Grande*, 2012 MT 67, ¶ 23, 364 Mont. 333, 274 P.3d 728. Unless otherwise indicated, our references to applicable statutes will be to the 2007 version.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 On December 21, 2007, Malcomson suffered a back injury while performing her work duties. She sought medical treatment and filed a workers' compensation claim on the same day. Liberty hired Annie Young, a registered nurse with PACBLU Northwest, to act as Malcomson's medical case manager and as Liberty's agent. Young presented to Malcomson a Claimant's Authorization form that Malcomson signed on January 3, 2008. This is a form that workers' compensation claimants must sign in order to receive workers' compensation benefits. In accordance with § 39-71-604(3), MCA, the authorization form provided that Malcomson's healthcare providers and Liberty could release healthcare information relevant to Malcomson's workers' compensation claim to one another or their agents. The authorization provided that communication between her doctors and Liberty could take place without Malcomson's knowledge or opportunity to participate. A few days later, Malcomson signed a second Claimant's Authorization form containing the same language. Both authorization forms provided that Malcomson could revoke her authorization in writing at any time and the revocation would be effective upon receipt by Liberty.

¶4 Young immediately began arranging appointments for Malcomson with providers not of Malcomson's choosing. Young attended appointments with Malcomson, changed appointments to dates she deemed to be more compatible with Young's schedule, and contacted Malcomson's doctors without Malcomson's knowledge.

¶5 On March 7, 2008, Liberty notified Malcomson by mail that it was terminating her temporary partial disability (TPD) wage benefits because Freemo's notified Liberty that Malcomson had been terminated from her job on February 23, 2008, for disciplinary reasons.

3

On March 12, 2008, Malcomson, through counsel, requested that her TPD benefits be reinstated pending resolution of the dispute surrounding her termination. In the same letter, Malcomson revoked the releases and authorizations she had signed previously, expressly stating that neither Liberty nor PACBLU nor any of their agents had her permission to "speak" to her healthcare providers without first notifying Malcomson or her attorney and providing them an opportunity to participate in the communication.[2] In lieu of the authorization, Malcomson offered to provide a HIPAA-compliant release that would allow Liberty to obtain copies of her medical file and bills without prior notice to her.

¶6      On March 31, 2008, Liberty notified Malcomson's counsel that it would not reinstate Malcomson's TPD benefits. Moreover, Liberty indicated that because Malcomson had revoked the release authorizing ex parte communications, it was terminating her medical benefits as well. Despite subsequent attempts to fashion a release that was acceptable to both Malcomson and Liberty, the parties were unable to do so.

¶7      On June 20, 2008, Malcomson filed a Petition for Emergency Trial with the WCC asserting that the statutes relied upon by Liberty to terminate her medical benefits—*i.e.*, §§ 39-71-604 and 50-16-527, MCA—were unconstitutional. On September 14, 2011, and resuming on November 17, 2011, the WCC conducted a trial and heard testimony from numerous witnesses including Malcomson, Liberty and PACBLU employees, doctors,

---

[2] After Malcomson filed this action with the WCC, she discovered that Young had billed 1.1 hours for four telephone calls made directly to Malcomson's doctor between March 13 and March 27. These calls were made without her knowledge and after Malcomson revoked Liberty's and PACBLU's right to speak to Malcomson's medical providers.

4

nurses, and counselors. On August 16, 2013, the WCC issued its Findings of Fact, Conclusions of Law and Judgment.

¶8 As a preliminary matter, the WCC noted that Liberty had terminated Malcomson's medical benefits under both §§ 39-71-604 and 50-16-527, MCA, and that Malcomson had challenged the constitutionality of both statutes. Although the two statutes are virtually identical, the WCC concluded that it lacked jurisdiction to review the constitutionality of a statute codified under the Uniform Healthcare Information Act. It therefore limited its ruling to Malcomson's challenge of § 39-71-604, MCA. This determination is not on appeal.

¶9 The WCC held that § 39-71-604(3), MCA, as applied in Malcomson's case, violated Malcomson's constitutional right of privacy because it allowed Liberty to discuss wide-ranging healthcare information with Malcomson's doctors, nurses, and therapists— some of which may not be relevant to Malcomson's workers' compensation claim—without giving Malcomson or her attorney notice and the opportunity to participate in the communication. The WCC concluded that while the State has a compelling interest in the orderly administration of the workers' compensation process, the statute at issue was not narrowly tailored to effectuate that interest. It held that the statute abrogated the claimant's ability to safeguard her constitutional right of privacy and in so holding, rejected Liberty's argument that the statute was constitutional because it allowed the insurer to discuss only *relevant* healthcare information with a healthcare provider ex parte. The court recognized, however, that insurers have a legitimate reason to engage in administrative contact with healthcare providers, and concluded that a release crafted to grant an insurer limited ex parte contact to facilitate and expedite the administrative aspects of the claim handling

5

procedure—such as scheduling appointments and requesting medical records—would not violate a claimant's right of privacy.

¶10 Liberty filed a timely appeal.

**STANDARD OF REVIEW**

¶11 We review the WCC's factual findings to determine whether they are supported by substantial credible evidence and its conclusions of law for correctness. "Substantial credible evidence is evidence that a reasonable mind might accept as adequate to support a conclusion." Additionally, this Court accords a high level of deference to the WCC's factual findings, and we will consider evidence "substantial even if it is contradicted by other evidence, even if it is somewhat less than a preponderance, and even if it is inherently weak." *Stewart v. Liberty Northwest Ins. Corp.*, 2013 MT 107, ¶¶ 16 and 31, 370 Mont. 19, 299 P.3d 820 (internal citations omitted).

¶12 "The party challenging the constitutionality of a statute bears the burden of proving the statute unconstitutional beyond a reasonable doubt." *Henry v. State Compen. Ins. Fund*, 1999 MT 126, ¶ 11, 294 Mont. 449, 982 P.2d 456.

**DISCUSSION**

¶13 *Did the WCC err in concluding that § 39-71-604(3), MCA, violated Malcomson's right of privacy set forth at Article II, Section 10 of the Montana Constitution?*

¶14 First, we briefly address the appropriate level of scrutiny to be applied to the challenged statute. Malcomson argued and the WCC agreed that the appropriate level of scrutiny for the statutory challenge was strict scrutiny, as the fundamental right of privacy was implicated. In its briefing before this Court, Liberty does not challenge the WCC's

application of a strict scrutiny standard nor does it urge us to apply rational basis review. During oral argument, counsel for Liberty acknowledged that Liberty had not appealed from the WCC's application of strict scrutiny review to this case. Rather, Liberty argues that because Malcomson has failed to establish that the statute even implicates the right of privacy, the statute simply does not run afoul of the Constitution. Because Liberty has not challenged the WCC's level of scrutiny, we accept as correct the WCC's conclusion of law that strict scrutiny should be applied when analyzing § 39-71-604(3), MCA, because it implicates privacy rights of constitutional significance. The right of privacy being a fundamental right, legislation that infringes the exercise of the right of privacy must be reviewed under a strict scrutiny analysis. The statute must be justified by a compelling state interest and must be narrowly tailored to effectuate only that interest. *Armstrong v. State*, 1999 MT 261, ¶ 34, 296 Mont. 361, 989 P.2d 364.

¶15 The primary dispute in this case is whether the challenged statute, § 39-71-604(3), MCA, implicates the right of privacy as guaranteed by Article II, Section 10 of the Montana Constitution. Malcomson asserts it does; Liberty maintains it does not.

¶16 Section 39-71-604(3), MCA, provides:

> A signed claim for workers' compensation or occupational disease benefits or a signed release authorizes a workers' compensation insurer, as defined in 39-71-116, or the agent of the workers' compensation insurer to communicate with a physician or other health care provider about relevant health care information, as authorized in subsection (2), by telephone, letter, electronic communication, in person, or by other means, about a claim and to receive from the physician or health care provider the information authorized in subsection (2) *without prior notice to the injured employee, to the employee's authorized representative or agent,* or in the case of death, to the employee's personal representative or any person with a right or claim to compensation for the injury or death. (Emphasis added.)

7

"Relevant health care information" is defined as:

> Health care information relevant to the claimant's condition may include past history of the complaints of or the treatment of a condition that is similar to that presented in the claim, conditions for which benefits are subsequently claimed, other conditions related to the same body part, or conditions that may affect recovery.

Section 39-71-604(2), MCA.

¶17 We begin our discussion with a brief history of the subject statute. The Montana Worker's Compensation Act was first adopted in 1915. For 88 years, the provisions under the Act with respect to filing an application for compensation were administered without the inclusion of § 39-71-604(3), MCA, quoted above. This paragraph, authorizing ex parte communications between a claimant's healthcare provider and an insurer, was adopted by the legislature in 2003. On October 18, 2005, the WCC ruled in a declaratory judgment action that § 39-71-604(3), MCA (2003), was unconstitutional because it violated the petitioner's constitutional right to due process. *Thompson v. State*, 2005 MTWCC 53. While this decision remained in effect, ex parte communications between insurers and a claimant's healthcare providers were not permitted. Subsequently, on September 7, 2007, the Supreme Court reversed the decision of the WCC on procedural grounds, concluding that the WCC did not have jurisdiction to issue a declaratory judgment. The provisions of § 39-71-604(3), MCA (2003), were therefore resurrected.

¶18 Article II, Section 10 of the Montana Constitution guarantees:

> The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

8

¶19    Liberty argues that this is not a "right of privacy" case and should not have been decided as one. It asserts that the WCC failed to apply the required two-prong test this Court adopted to determine *if the right of privacy is implicated*, *i.e*., the *Katz* test, and, if it had applied the test, the test would not have been satisfied.

¶20    The two-prong *Katz* test upon which Liberty relies requires a determination of whether the person claiming the right of privacy has (1) a subjective or actual expectation of privacy (2) that society is willing to recognize as reasonable. This Court first adopted the test set forth in *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967), in *Hastetter v. Behan*, 196 Mont. 280, 639 P.2d 510. Since then, we have applied the *Katz* test in numerous cases in which the constitutional right of privacy has been potentially implicated, including search and seizure cases,[3] right to know cases,[4] and right of privacy cases.[5]

¶21    Liberty maintains that Malcomson could not have an actual or subjective expectation of privacy as to any medical information relevant to her claim because the WCC laws clearly place her on notice that such information must be provided to the insurer. In other words, Malcomson has no right of privacy in her medical information because she is on notice that the statute has taken that right away. We reject Liberty's *Katz* argument for two reasons.

¶22    First, Liberty's argument is oversimplified. Malcomson does not dispute that an insurer is entitled to have access to medical information relevant to her claim for benefits.

---

[3]  *State v. Hill*, 2004 MT 184, 322 Mont. 165, 94 P.3d 752.

[4]  *Montana Human Rights Div. v. Billings*, 199 Mont. 434, 649 P.2d 1283 (1982); *State ex rel. Great Falls Tribune Co. v. Montana Eighth Judicial Dist. Court*, 238 Mont. 310, 777 P.2d 345 (1989).

[5]  *Gryczan v. State*, 283 Mont. 433, 942 P.2d 112 (1997); *State v. Nelson*, 283 Mont. 231, 941 P.2d 441 (1997).

What she objects to is the provision of the statute which permits an agent of the insurer to communicate directly with her physicians or other healthcare providers—personally or by any other means—without prior notice to her or the opportunity to participate in the discussion. Thus, she objects not to Liberty's right of access to relevant medical information, but rather to the method of access the statute permits it to utilize. Liberty's attempt to sweep away all expectation of privacy ignores the distinction made in the revised statute between the right of access to medical information and the method whereby that access is accomplished.

¶23 Second, as the WCC observed, this Court "has long recognized that the privacy interests concerning a person's medical information implicate Article II, Section 10, of the Montana Constitution." *Nelson*, 283 Mont. at 241-42, 941 P.2d at 447-48 (1997). In *Nelson*, we applied the *Katz* test to Nelson's claim that BAC test results obtained by a hospital treating Nelson's injuries were entitled to constitutional protection. We concluded that "[m]edical records are quintessentially 'private' and deserve the utmost constitutional protection." *Nelson*, 283 Mont. at 242, 941 P.2d at 448. We said that such records could be discovered by way of investigative subpoena only upon a showing of compelling state interest under Article II, Section 10 of the Montana Constitution. *Nelson*, 283 Mont. at 242, 941 P.2d at 449. As *Nelson* establishes, this Court has already affirmatively applied *Katz* to a claim of privacy in one's medical information, and has found the expectation of privacy to be of constitutional significance. This being so, the fact that the WCC did not perform a *Katz* analysis in this case is of no moment.

¶24 Having established that our jurisprudence has long recognized a person's privacy expectation in her medical information, we now turn back to § 39-71-604(3), MCA, to determine whether it passes constitutional muster. As noted above, legislation that infringes the right of privacy must be reviewed under a strict scrutiny analysis. The subject statute must be justified by a compelling state interest and be narrowly tailored to effectuate that purpose. *Gryczan*, 283 Mont. at 449, 942 P.2d at 122.

¶25 We agree with Malcomson and the WCC that the State has a compelling interest in the orderly administration of the workers' compensation process. We further agree that the statute at issue is not narrowly tailored to effectuate that interest. Section 39-71-604(2), MCA, provides that by making a claim for workers' compensation benefits, a claimant authorizes her physician or other healthcare provider to disclose or release information relevant to the claimant's condition to the workers' compensation insurer. This provision is not challenged here. At issue, rather, is the provision of § 39-71-604(3), MCA, that permits an agent of the insurer to communicate directly with a physician or other healthcare provider and receive "relevant healthcare information" without prior notice to the claimant or her authorized representative or agent.

¶26 Malcomson argues that she cannot protect her right of privacy if she is excluded from communications between Liberty and her healthcare providers. While she concedes that Liberty is entitled to relevant healthcare information pertaining to her claim, her concern is that irrelevant medical information could be disclosed by her healthcare providers to Liberty in her absence, or that negative comments made by Liberty's agents to those providers could adversely impact their perception of her as a patient and the manner in which they manage

11

her medical care. In support of her concerns, she cites multiple exchanges between Young and members of her medical team that took place outside her presence which she claims were intended by Young to paint her in a poor light. By way of example, it is undisputed that Young complained to Malcomson's therapist that Malcomson "rambles on" and "spends a great deal of [Liberty's] time/efforts with repetitive information." Young also suggested that the therapist not accommodate Malcomson if she was running late or running early for her appointment. Malcomson fears that if Liberty has unfettered access to her healthcare providers, she will never know whether it has obtained irrelevant medical information or has cast her in a negative light to her prejudice, and she will be wholly unable to protect her privacy interest in medical information that is irrelevant to her claim. We agree with Malcomson and the WCC that these concerns are valid and justified.

¶27 This Court has previously disapproved of private interviews and correspondence between an insurer and a claimant's physicians for similar reasons. In *Linton v. Great Falls*, 230 Mont. 122, 749 P.2d 55 (1988), we addressed whether the WCC erred in allowing State Fund to conduct private conversations with Linton's doctors. Applying a previous version of § 39-71-604, MCA, we said that while a claimant waives any privilege of confidentiality as to healthcare information which is relevant to the subject matter of her claim, a personal interview between the insurance company and a claimant's treating physician "must be done openly to allay any suspicion that there is something available to one party, and not to the other." *Linton*, 230 Mont. at 134, 749 P.2d at 63. *See also Jaap v. District Court of the Eighth Judicial Dist.*, 191 Mont. 319, 623 P.2d 1389 (1981), in which we held that the Rules

12

of Civil Procedure addressing discovery do not allow private conversations with another party's physicians or medical team.

¶28 As *amicus curiae*, the State of Montana also argues that Malcomson has no reasonable expectation of privacy in the disclosure of relevant medical information to insurers. Because disclosure under the statute is expressly limited to relevant information, the State continues, the statute is not subject to strict scrutiny and the mere specter of potential for abuse by insurers does not render the statute infirm. Further, both Liberty and the State point out that the workers compensation system is designed to be self-administering and to minimize reliance on the court system. Section 39-71-105(3), MCA. The State cites a Florida Court of Appeals case, *S & A Plumbing v. Kimes*, 756 So. 2d 1037 (Fl. Ct. App. 2000), in support of its position. The court in *Kimes* determined that Florida's constitutional right of privacy was not implicated by a similar *ex parte* communication statute because the Florida workers compensation system "transposed dispute resolution for workplace injuries from the private law of torts to a publicly administered and regulated system" under which a claimant consents to disclosure of relevant healthcare information. *Kimes*, 756 So. 2d at 1042.

¶29 We made clear in *Nelson* that Montana's right of informational privacy, "at a minimum, encompass[es] the sanctity of one's medical records." *Nelson*, 283 Mont. at 242, 941 P.2d at 448. The State's arguments fail to appreciate that this constitutional right encompasses a "fundamental" right "to control circulation of personal information." *Nelson*, 283 Mont. at 241, 941 P.2d at 448 (quoting *Cutter v. Brownbridge*, 228 Cal. Rptr. 545, 549 (Cal. Ct. App. 1986)). That a worker consents to release of relevant medical information

13

does not mean the worker loses all privacy interests in how that information is circulated or disseminated. The right to control circulation of private information would be lost if the individual does not know what healthcare information is being circulated or to whom.

¶30 The argument that § 39-71-604(3), MCA, is not narrowly tailored to effectuate the State's interest in the orderly administration of workers' compensation cases finds support in both the history of the subject statute and the admissions of counsel. As we note in ¶ 17, the Workers' Compensation Act has been in effect for nearly 100 years. For 90 of those years, the Act contained no provision allowing agents of the insurer to communicate directly with healthcare providers without prior notice to the injured employee, and yet relevant medical information was obtained by insurers adjusting claims. Moreover, during the years 2005-2007 when the 2003 statute allowing *ex parte* communications was put on hold by virtue of the Workers' Compensation Court's decision in *Thompson*, the parties exchanged information by open email to which a claimant or her attorney was privy. When asked during oral argument if this system was not workable, counsel for Liberty responded: "Not at all, your honor. It is workable." This concession was buttressed by the testimony of agents for insurers who testified at Malcomson's trial that they are able to obtain all the information they need to process and administer a claim without having private talks with a claimant's physician.

¶31 In sum, the State's interest in the orderly administration of workers' compensation cases was adequately effectuated for nearly 100 years *without* the necessity of *ex parte* communications. The method for obtaining relevant medical information in effect before the 2003 amendment to § 39-71-604(3), MCA, was narrowly tailored to effectuate the State's

14

interests. Because the State has long been able to administer the workers' compensation program without exposing injured workers to a potential violation of their constitutional right of privacy, the statute as currently written is overbroad and cannot stand. *Montana Envtl. Info. Ctr. v. Dept. of Envtl. Quality*, 1999 MT 248, ¶ 63, 296 Mont. 207, 988 P.2d 1236 ("[A]ny statute or rule which implicates [a fundamental] right must be strictly scrutinized and can only survive scrutiny if the State establishes a compelling state interest and that its action is closely tailored to effectuate that interest and is the least onerous path that can be taken to achieve the State's objective."). We therefore conclude that the unconstitutionality of § 39-71-604(3), MCA (2003), under Article II, Section 10 of the Montana Constitution has been established beyond a reasonable doubt and we affirm the conclusion of the WCC to that effect.

¶32 The WCC concluded that the statute was unconstitutional as applied to Malcomson's case, even though she had also argued to the WCC that the statute was facially unconstitutional. The WCC's opinion broadly concluded "that insurers may not violate an injured worker's right to privacy by seeking *ex parte* contact to discuss medical issues[.]" Further, the WCC held that "the statute is not narrowly tailored to effectuate" the State's "compelling interest in the orderly administration of the workers' compensation process[.]" These holdings are not limited to an "as-applied" challenge, but extend to other claimants affected by the statute. We therefore conclude that the statute is facially unconstitutional because it would impose the same violation of privacy interests on every injured worker to whom it was applied.

15

¶33    Finally, we concur with the WCC's conclusion that insurers have a legitimate interest in engaging in *ex parte* contact with healthcare providers for the sole purpose of facilitating the administrative aspects of the claim handling procedure, such as scheduling appointments and requesting medical records.  We agree with the WCC that a release crafted to authorize this type of limited *ex parte* contact would not violate a claimant's right of privacy.

**CONCLUSION**

¶34    For the foregoing reasons, we conclude the WCC did not err in ruling that § 39-71-604(3), MCA, "is unconstitutional because it violates Macolmson's constitutional right of privacy."  We further conclude the WCC did not err in concluding that a narrowly crafted release authorizing insurers to have *ex parte* contact with healthcare providers solely for administrative purposes would not violate a claimant's right of privacy.


                                                    /S/ PATRICIA COTTER



We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ JIM RICE
/S/ RAY DAYTON
District Court Judge Ray Dayton sitting
for the vacant position with the Court.